UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KATHERINE MAE MCKEE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 15-30221-MGM |
| WILLIAM H. COSBY, JR., | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION TO DISMISS
(Dkt. No. 41)

February 16, 2017

MASTROIANNI, U.S.D.J.

I.   INTRODUCTION

In this action, Katherine Mae McKee ("Plaintiff") asserts defamation claims against William

H. Cosby, Jr. ("Defendant") for various statements contained in a letter written to the New York

Daily News ("Daily News") in response to the newspaper's publication of Plaintiff's accusation that

Defendant sexually assaulted her in the 1970s. The letter, itself detailed in the media, demanded that

the Daily News retract the article containing Plaintiff's allegations and faulted that newspaper for

failing to consider "[e]asily available public information" purportedly undermining Plaintiff's

credibility. (Dkt. No. 30, Am. Compl., Ex. A.) Presently before the court is Defendant's motion to

dismiss Plaintiff's amended complaint for failure to state a claim upon which relief can be granted.

II.  STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, the court must accept all well-pleaded facts as true and draw all reasonable

inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá*, 687 F.3d 465, 471 (1st Cir. 2012). The burden is on the moving party to demonstrate that even when viewed in the light most favorable to the plaintiff, the complaint lacks "sufficient factual matter" to state an actionable claim for relief that is "'plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In evaluating the sufficiency of the factual allegations contained in the complaint, the court must be careful to credit the factual assertions made by the plaintiff while disregarding "legal conclusions," such as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A complaint must survive a motion to dismiss if the facts alleged are sufficient as to each element to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Lister v. Bank of Am., N.A.*, 790 F.3d 20, 23 (1st Cir. 2015) ("Dismissal for failure to state a claim is appropriate if the complaint does not set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." (internal quotation marks omitted)).

## III. BACKGROUND

The following facts come directly from Plaintiff's amended complaint and the attachment thereto. Plaintiff, who resided in Nevada when she commenced this action, is an accomplished performer and actress and has worked in the entertainment industry for over fifty years. (Dkt. No. 1, Compl. ¶ 1; Am. Compl. ¶ 2.) She currently works as an independent casting director. (Am. Compl.

¶ 3.) Defendant, who resides in Massachusetts, is an internationally well-known celebrity and entertainer. (*Id.* ¶ 4.)

Plaintiff first met Defendant around 1964, when she was working as an aspiring actress and "showgirl" in Las Vegas, Nevada. (*Id.* ¶ 9.) In 1971, Plaintiff appeared as an actress on the "Bill Cosby Show." (*Id.* ¶ 10.) Thereafter, Plaintiff believed Defendant was a friend and socialized with him and his wife on various occasions. (*Id.* ¶ 11.)

One day in 1974, by coincidence, both Plaintiff and Defendant were in Detroit, Michigan, and Defendant asked Plaintiff to meet him socially. (*Id.* ¶ 12.) He requested that she bring ribs from a local restaurant to his hotel room, after which he would take her to a party on a friend's boat docked in the Detroit River. (*Id.* ¶ 13.) When Plaintiff arrived at the hotel room, Defendant, who was wearing a bathrobe and a knit wool cap, invited her in. (*Id.* ¶ 14.) Immediately after Plaintiff entered the room, Defendant physically attacked her, grabbing the ribs from her hand and tossing them aside. (*Id.* ¶¶ 15-16.) Defendant "violently and forcefully grabbed [Plaintiff] and spun [her] around so that she was facing away from [Defendant] and toward the door." (*Id.* ¶ 18.) Defendant then "violently lifted her dress," "pulled down her panties," and "proceeded to forcibly rape [Plaintiff] while both were still standing near the door." (*Id.* ¶¶ 19, 21.)

In mid-December of 2014, Nancy Dillon of the Daily News interviewed Plaintiff, who revealed the rape perpetrated by Defendant. (*Id.* ¶ 23.) On December 22, 2014, the Daily News published a news article written by Dillon describing the rape. (*Id.* ¶ 24.) That same day, Defendant, through his attorney Martin Singer, wrote a six-page letter to the Daily News addressing the article ("Singer Letter" or "Letter"). (*Id.* ¶ 36, Ex. A.) In general, the Singer Letter admonished the Daily News for publishing the article despite what Singer claimed were publicly available statements from

Plaintiff (and her sister) demonstrating her lack of credibility.[1] (Am. Comp., Ex. A.) The Singer

Letter disclosed those alleged statements and provided webpage links to the sources in footnotes.

(*Id.*) The Singer Letter criticized the Daily News's "journalistic standard[s]" in covering Plaintiff's

allegations as well as "the media" in general in covering the "stories" of "various [other] women."

(*Id.* at 2.) Singer accused the Daily News of "publishing a malicious defamatory article" and stated

the newspaper "will have only itself to blame if it finds itself in court attempting to defend its

ongoing pattern of recklessly and maliciously publishing stories about my client fitting with its

predetermined smear agenda." (*Id.* at 1, 4.) Notably, Singer stated that Defendant himself "risks

being sued for defamation (as has already occurred)[2] if he so much as denies any scurrilous

accusations made against him." (*Id.* at 4.) Singer demanded "[p]ublication of a retraction and

correction of the defamatory Story." (*Id.*) The Singer Letter closed by stating: "This letter is a

confidential legal communication and is not for publication."[3] (*Id.*)

On December 22, 2014, Singer sent the Letter to the Daily News's head office in New York

City via email. (Am. Compl. ¶ 38.) Plaintiff alleges Singer also leaked a copy of the letter to the

Hollywood Reporter as well as other media outlets that same day. (*Id.*) Also on December 22, 2014,

various statements from the Singer Letter were published in news stories around the world,

including by the Daily Mail website, the Associated Press, and the Spanish-language periodical

"Reforma."[4] (*Id.* ¶ 47.) The following day, the Daily News published a news article about the Singer

---

[1] The full Singer Letter is set forth in an appendix to this opinion. The specific statements Plaintiff challenges as defamatory are also discussed in the analysis below.

[2] A separate defamation action brought against Defendant based on different statements, which is also pending in this court, was filed on December 10, 2014. *See generally Green v. Cosby*, 138 F. Supp. 3d 114 (D. Mass. 2015).

[3] The Singer Letter also contained a disclaimer at the top of the first page stating: "CONFIDENTIAL LEGAL NOTICE" and "PUBLICATION OR DISSEMINATION IS PROHIBITED." (*Id.* at 1.)

[4] Plaintiff alleges "[t]he only explanation for the rapid dissemination of the Singer Letter on December 22, 2014, is that Singer himself intentionally leaked [it] to media outlets." (*Id.*)

Letter wherein it described at least some of the letter's content, as did HollywoodReporter.com. (*Id.* ¶¶ 44, 45.)

Plaintiff alleges the Singer Letter caused harm to her reputation "days, weeks or even months" after it was originally sent to the Daily News, due to the publication of the news articles which reported on its content. (*Id.* ¶¶ 65, 67.) "Over time, [Plaintiff's] reputation was damaged equally in all fifty . . . states." (*Id.* ¶ 67.) Plaintiff resided in the State of Michigan on December 22, 2014, when the Singer Letter was first sent to the Daily News. (*Id.* ¶ 68.) However, "she was in the process of changing her residence to the State of Nevada" at that time. (*Id.*) Approximately six months later, in June of 2015, Plaintiff moved her residence to Nevada with the intent to remain there. (*Id.*)[5]

Plaintiff, proceeding without the assistance of counsel at the time, commenced this action on December 21, 2015, invoking the court's diversity jurisdiction under 28 U.S.C. § 1332. (Compl.) After the court granted Plaintiff an extension of time for accomplishing service, Defendant filed a motion to dismiss targeting Plaintiff's original complaint on June 10, 2016. (Dkt. Nos. 9, 22.) In response, Plaintiff, after obtaining counsel, filed the operative amended complaint as a matter of course pursuant to Fed. R. Civ. P. 15(a)(1)(B), and Defendant withdrew his original motion to dismiss. (Dkt. Nos. 30, 32.) Defendant filed the pending motion to dismiss targeting Plaintiff's amended complaint on August 16, 2016, Plaintiff (after obtaining two extensions) filed an opposition on October 12, 2016, and Defendant filed a reply brief on October 24, 2016. (Dkt. Nos. 41, 47, 50.) The court held a hearing on November 15, 2016. (Dkt. No. 55.)

---

[5] Although Plaintiff alleges that on December 22, 2014, Michigan was not her domicile—because she "had already formed the intent to move to Nevada," (*id.* ¶ 69)—the court does not credit this allegation, as it is plainly a legal conclusion not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Rather, in its choice of law analysis, the court considers only the factual allegations contained in the amended complaint and applies those facts to the legal standard for determining an individual's domicile.

IV. DISCUSSION

A.    Choice of Law

Before resolving the merits of Defendant's motion to dismiss, the court must determine the substantive law that governs this dispute. Because this is a diversity action, state substantive law applies (subject to certain constitutional protections, as discussed below). *Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 427 (1996). Moreover, in deciding *which* state's substantive law applies, the court follows the choice-of-law rules of the forum state: Massachusetts. *In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 14 (1st Cir. 2012). As this court explained in *Green v. Cosby*, a separate defamation action brought against Defendant, "Massachusetts courts 'consider choice-of-law issues by assessing various choice-influencing considerations, . . . including those provided in the *Restatement (Second) of Conflict of Laws* (1971).'" 138 F. Supp. 3d 114, 124 (D. Mass. 2015) (quoting *Cosme v. Whitin Mach. Works, Inc.*, 632 N.E.2d 832, 834 (Mass. 1994)). And "[p]ursuant to section 150 of the *Restatement (Second) of Conflict of Laws*, 'the law of the state where the defamed person was domiciled at the time of publication applies if the matter complained of was published in that state.'" *Id.* (quoting *Davidson v. Cao*, 211 F. Supp. 2d 264, 274 (D. Mass. 2002)). Accordingly, in *Green*, this court applied the law of the states where each plaintiff "was domiciled when the alleged publication occurred"—namely, California and Florida—because "[t]he statements at issue . . . were published nationally." *Id.*

When the statements in this case were published, Plaintiff was and had been living in Michigan; however, each party tactically advocates for application of another state's law. Defendant emphasizes the conclusory allegations made in Plaintiff's complaint that Michigan "was no longer [Plaintiff's] domiciliary state." (Am. Compl. ¶ 69.) Defendant argues Nevada law governs because Plaintiff intended to change her residence to that state when the Singer Letter was published and it is where Plaintiff was domiciled when she was *harmed* by the defamation. As for Plaintiff, she

emphasizes her intent to relocate to Nevada but contends Massachusetts law should be applied because it is the state with the most compelling interest in this action.

Despite Plaintiff's future intention to move, the fact remains that she did not do so until over six months after the Singer Letter was sent to the Daily News and had been reported on both nationally and internationally. (*Id.* ¶¶ 44-45, 47, 68.) "A person may have only one domicile at a time and, until a new one is acquired, the established one continues." *Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698, 701 (1st Cir. 1979); *Tuelle v. Flint*, 186 N.E. 222, 223 (Mass. 1933). And "to effect a change to one's legal domicil, two things are indispensable: First, residence in a new domicil; and second, the intention to remain there." *Hawes*, 598 F.2d at 701 (quoting *Sun Printing & Publ'g Assoc. v. Edwards*, 194 U.S. 377, 383 (1904)); *see Tuelle*, 186 N.E. at 223 ("Intention without the concurrence of the fact of residence is not sufficient to change or to create domicil."). As of December 22, 2014, Plaintiff had not yet changed her residence to Nevada, so her domicile could not have changed. Plaintiff has also filed a declaration explaining that she lived in Michigan from 1994 to July of 2015. (Dkt. No. 47, Ex. Y, Pl.'s Decl. ¶¶ 18, 20.) In addition, Plaintiff asserted that as of December 22, 2014, she was registered to vote, had a driver's license, registered her car, and owned a business in Michigan. (*Id.* ¶ 25.) *See Meléndez-Garcia v. Sanchez*, 629 F.3d 25, 41 (1st Cir. 2010) (discussing factors for determining domicile, including where the individual is registered to vote, has a driver's license, and operates a business); *Caffyn v. Caffyn*, 806 N.E.2d 415, 420 (Mass. 2004).

In addition, Plaintiff has alleged she was harmed within "days, weeks, or even months" of the Singer Letter's publication to the Daily News. (Am. Compl. ¶ 68.) The amended complaint alleges that articles reporting on the content of the Singer Letter were published in "news outlets around the word" beginning on December 22, 2014. (*Id.* ¶¶ 44-45, 47.) The court therefore infers

Plaintiff suffered harm from the alleged defamation while she was domiciled in Michigan.[6]

Accordingly, where application of state substantive law is required, this court will apply that of

Michigan.

B.    <u>Merits</u>

    1.    <u>General Defamation Principles</u>

"Modern defamation law is a complex mixture of common-law rules and constitutional

doctrines." *Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc.*, 804 F.3d 59, 64 (1st Cir. 2015). Under

Michigan common law,

> [t]o prevail on a claim for defamation, a plaintiff must establish the following elements:
> "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged
> communication to a third party, (3) fault amounting at least to negligence on the part
> of the publisher, and (4) either actionability of the statement irrespective of special
> harm (defamation per se) or the existence of special harm caused by publication
> [defamation per quod]."

*Armstrong v. Shirvell*, 596 F. App'x 433, 441 (6th Cir. 2015) (unpublished) (quoting *Mitan v. Campbell*,

706 N.W.2d 420, 421 (Mich. 2005)). In Michigan, a communication is considered "defamatory" if "it

tends to lower an individual's reputation in the community or deters third persons from associating

or dealing with that individual." *Id.* (quoting *Ireland v. Edwards*, 584 N.W.2d 632, 636 (Mich. App. Ct.

1998)). Moreover, under the "substantial truth doctrine" recognized in Michigan, "a 'statement is

not considered false unless it would have a different effect on the mind of the reader from that

which the pleaded truth would have produced.'" *Collins v. Detroit Free Press, Inc.*, 627 N.W.2d 5, 9

(Mich. App. Ct. 2001) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)). In

other words, "minor differences are immaterial if the literal truth produces the same effect" as the

challenged communication. *Koniak v. Heritage Newspapers, Inc.*, 499 N.W.2d 346, 348 (Mich. App. Ct.

---

[6] Again, this conclusion is consistent with Plaintiff's declaration: "On or about December 23, 2014, and continuing
thereafter, I learned about the defamatory statements contained in the Singer Letter from various news reports, which
appeared in printed form and on the internet." (Pl.'s Decl. ¶ 24.)

1993); *see also Rouch v. Enquirer & News of Battle Creek (After Remand)*, 487 N.W.2d 205, 215 (Mich. 1992) ("Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." (quoting *Masson*, 501 U.S. at 517)).

"On the constitutional side, the Supreme Court—reading the First Amendment (made binding on the states through the Fourteenth)—'has hedged about defamation suits' with lots of 'safeguards designed to protect a vigorous market in ideas and opinions.'" *Pan Am Sys.*, 804 F.3d at 65 (quoting *Desnick v. Am. Broad. Co.*, 44 F.3d 1345, 1355 (7th Cir. 1995)); *see also Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000) ("[T]he Supreme Court has read the First Amendment . . . to impose additional limitations on defamation cases, whether or not they are also part of state law."). One such First Amendment limitation is that "defamatory statements are not punishable unless they are capable of being proved true or false." *Pan Am Sys.*, 804 F.3d at 65; *see also Green*, 138 F. Supp. 3d at 130. "Because defamation requires a false statement at its core, opinions typically do not give rise to liability since they are not susceptible" to objective verification. *Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015); *see also Veilleux v. Nat'l Broad Co.*, 206 F.3d 92, 108 (1st Cir. 2000) ("[O]nly statements that are 'provable as false' are actionable; hyperbole and expressions of opinion unprovable as false are constitutionally protected."). Moreover, the First Circuit has explained that "even a provably false statement is not actionable if 'it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts.'" *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002) (quoting *Gray*, 221 F.3d at 248).

"Merely couching a statement as an opinion, however, will not automatically shield the speaker from liability where the statement implies the existence of underlying defamatory facts." *Piccone*, 785 F.3d at 771; *see Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990). On the other hand, "defamation cannot arise where the speaker communicates the non-defamatory facts that

undergird his opinion." *Piccone*, 785 F.3d at 771. "Thus, the speaker can immunize his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion is based." *Id.*; *see Riley*, 292 F.3d at 289 ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995)). For First Amendment purposes, therefore, "the relevant question is not whether challenged language may be described as an opinion, but whether it reasonably would be understood to declare or imply provable assertions of fact." *Piccone*, 785 F.3d at 771 (quoting *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 727 (1st Cir. 1992)).[7]

This question "is of constitutional dimension and, thus, federal law controls." *Pendelton v. City of Haverhill*, 156 F.3d 57, 68 (1st Cir. 1998).[8] As such, the court is bound by First Circuit precedent; it "owes no deference to state-court interpretation of the United States Constitution" or the interpretations of other circuit or district courts (but, of course, may consider those sources to the extent they are consistent with First Circuit and Supreme Court precedent). *TMJ Implants, Inc. v.*

---

[7] In the classic example, the Supreme Court explained: "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth." *Milkovich*, 497 U.S. at 18. In contrast, the Court observed, "the statement, 'In my opinion Mayor Jones shows abysmal ignorance by accepting the teachings of Marx and Lenin,' would not be actionable." *Id.* at 20. Justice Brennan cited a similar example of a nonactionable statement in his dissent:

> A writes to B about his neighbor C: "He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic."

*Id.* at 27 n.3 (Brennan, J., dissenting) (quoting *Restatement (Second) of Torts* § 566, cmt. c).

[8] It is also a question of law for the court in the first instance. *See Gray*, 221 F.3d at 248 ("[T]he courts treat the issue of labeling a statement as verifiable fact or as opinion as one ordinarily decided by judges as a matter of law." (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510-11 (1984))); *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997) ("[T]he deference traditionally shown by courts toward factfinders' determinations is muted when defamation issues implicate free speech concerns" as "'a rule of federal constitutional law' that 'reflects a deeply held conviction that judges . . . must exercise such review in order to preserve the precious liberties established and ordained by the Constitution.'" (quoting *Bose*, 466 U.S. at 510-11)). If, however, the court concludes "a statement is capable of carrying a defamatory meaning" and "a reasonable fact-finder could interpret it as containing false assertions of fact," whether such a statement ultimately constitutes defamation must be decided by the fact-finder. *Ogle v. Hocker*, 279 F. App'x 391, 397 (6th Cir. 2008) (unpublished).

*Aetna, Inc.*, 498 F.3d 1175, 1181 (10th Cir. 2007); *see Nobles v. Boyd*, 2015 WL 2165962, at *9

(E.D.N.C. May 9, 2015) ("Although the court previously has determined California law governs

plaintiff's defamation claims, the court's analysis now must also include considerations of federal

law, because the requirement that an alleged defamatory statement be of fact, rather than opinion,

flows from the First Amendment. . . . Thus, the Fourth Circuit's interpretation of the First

Amendment controls." (citation omitted)). The court notes, however, "the common law of

defamation, federal constitutional law, and the constitutional law of the various states reflect many

of the same underlying principles," and state common or constitutional law may provide even more

extensive protections than those afforded by the United States Constitution. *TMJ Implants, Inc.*, 498

F.3d at 1181-82 (discussing the difficulty of determining whether the source of a limitation on

defamation claims in state-court decisions derives from state or federal law).[9] Here, the court need

not consider whether Michigan constitutional or common law is more protective of "opinions" than

the United States Constitution because Defendant has not made that argument and because the

court concludes the relevant statements are protected by the First Amendment. *See Phantom Touring*,

953 F.2d at 727 n.4.

  2.  <u>Application of General Defamation Principles to the Singer Letter as a Whole</u>

   Read as a whole, the "gist" or "sting" of the Singer Letter is: Plaintiff lacks credibility, and

thus is an unreliable news source, and the Daily News either failed to investigate or ignored certain

publicly available information purportedly undermining Plaintiff's claim. The Singer Letter,

therefore, contains both opinionated statements regarding Plaintiff's credibility and the facts on

which those opinions are based. The court analyzes the two sets of statements separately, asking: (1)

under the First Amendment, whether the "opinions" are capable of being proven true or false or

---

[9] In this court's previous analysis of First Amendment issues in *Green*, it, in retrospect, should have focused more on federal law, but the state-court-driven analysis produced the same results as would a direct application of federal law.

imply undisclosed defamatory facts; and (2) under state law, whether the facts provided are false and defamatory. *See Milkovich*, 497 U.S. at 18-19; *see also TMJ Implants*, 498 F.3d at 1185 ("[A]lthough an opinion based on disclosed defamatory facts is not itself subject to liability, the disclosure of the defamatory facts on which the opinion rests may still create liability if the facts themselves are false; it is the publication of the defamatory facts, however, rather than the expression of opinion, that is actionable." (citing *Restatement (Second) of Torts* § 566 cmts. b, c & illus. 5 (1977), and concluding that *Milkovich*, 497 U.S. at 18-19, stands for the same proposition)).

As discussed below, the court concludes the opinions as to Plaintiff's credibility are not capable of being objectively verified or disproven. The court also concludes the Singer Letter adequately disclosed the non-defamatory facts underlying the opinions so as to "immunize his [opinions] from defamation liability." *Piccone*, 785 F.3d at 771. Of particular importance is the breadth of the Singer Letter, which is six pages long and heavily footnoted with citations to articles and other sources supporting the author's view. *See Phantom Touring*, 953 F.2d at 730. The Singer Letter ostensibly recites all the facts supporting the opinions[10] and provides no indication that the opinions are based upon undisclosed objective facts. *See Piccone*, 785 F.3d at 772-73 ("Defendant explained the circumstances of the encounter, thus providing [the listener] with the factual basis underlying his opinion of Plaintiff's conduct." (citing *Restatement (Second) of Torts* § 566 cmt. b (1977)); *Milkovich*, 497 U.S. at 27 n. 3 (Brennan, J., dissenting) ("[C]lear disclosure of a comment's factual predicate precludes a finding that the comment implies other defamatory facts . . . .").

---

[10] Moreover, as discussed below, all the recited facts are either substantially true or non-defamatory (or both), except arguably two. *See* footnotes 23 and 25, *infra*. Those two facts, however, derive from a publicly available news story in which Plaintiff was interviewed. In addition, Plaintiff—a limited-purpose public figure—has not alleged facts demonstrating Singer or Defendant knew or recklessly disregarded the possibility that the story falsely recounted Plaintiff's statements. Accordingly, the inclusion of these facts, the accuracy of which Defendant had no reason to doubt, does not destroy the protection of the opinions asserted in the Singer Letter. *See Riley*, 292 F.3d at 289 ("[W]hen an author outlines the facts *available to him*, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." (quoting *Partington*, 56 F.3d at 1156-57) (emphasis added)).

In this way, the Singer Letter is similar to the statements at issue in *Piccone*. There, the plaintiffs—one of whom was seeking temporary custody of her brother's children after the parents fled the state—had a "tense exchange" with a town police chief regarding preparations for taking the children into the sister's care. *Piccone*, 785 F.3d at 768. Following the encounter, the police chief called the plaintiffs' employer[11] to complain about their unprofessional behavior and stated he believed the plaintiffs knew the whereabouts of the missing parents. *Id.* at 768-70. In doing so, he provided the employer details regarding the encounter and the investigation into the missing family. *Id.* The First Circuit explained that "[w]hether or not a particular person's behavior may be characterized as 'professional' or exhibiting 'professional courtesy' will often be a quintessential 'expression[] of personal judgment' which is 'subjective in character,'" and therefore cannot be objectively verified. *Id.* at 772 (quoting *Gray*, 221 F.3d at 248). In addition, the defendant's disclosure of "the non-defamatory facts about the confrontation . . . allowed [the listener] to form his own impression" of the plaintiffs' professionalism. *Id.* at 773. As for the statement regarding the plaintiffs' possible knowledge of the missing family's whereabouts, the First Circuit explained that assertion "'seems sufficiently factual to be proved true or false,' . . . and thus could, under certain circumstances, give rise to defamation liability." *Id.* (quoting *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 131 (1st Cir. 1997)). However, the First Circuit again concluded the defendant's

---

[11] The plaintiffs both worked for the United States Department of Homeland Security. *Id.* at 768. The First Circuit, however, did not consider whether the plaintiffs qualified as "public officials under the First Amendment." *Id.* at 775 n.3; *cf. Riley*, 292 F.3d at 288 ("In the case of a public-figure plaintiff the First Amendment requires clear and convincing proof of actual malice on the part of the defendant."). Nor did the First Circuit state that the defendant's speech related to a matter of "public concern." Instead, the First Circuit relied exclusively on the principle that the First Amendment limits state defamation law when the speech is not capable of being proved true or false and does not imply undisclosed defamatory facts. *See Piccone*, 785 F.3d at 771-72; *see also Phantom Touring*, 953 F.2d at 731 n.13 (explaining that in *Milkovich* the Supreme Court's reaffirmation of a line of earlier cases "confirmed that, to be actionable, a challenged statement must be understood as stating actual facts about an individual. That principle unquestionably excludes from defamation liability not only statements of rhetorical hyperbole—the type of speech at issue in the [earlier line of] cases—but also statements clearly recognizable as pure opinion because their factual premises are revealed").

disclosure of the non-defamatory facts underlying his belief protected him from defamation liability. *Id.* at 773-74.

This court reached the opposite conclusion in *Green*, 138 F. Supp. 3d 114. Unlike the Singer Letter in this case and the statements in *Piccone*, the three statements substantively addressed in *Green*[12] do imply undisclosed defamatory facts. For example, the "Newsweek Statement"—"This is a 10-year-old, discredited accusation that proved to be nothing at the time, and is still nothing"— could be understood to imply the false and defamatory assertion "that there was some unidentified investigation or hearing into the allegations which officially determined [the plaintiff's] accusation was false." *Id.* at 121, 133. The "November 20, 2014 Statement," which responded to an allegation that Defendant offered the plaintiff pills from a briefcase before assaulting her, stated in relevant part: "Ms. Traitz is the latest example of people coming out of the woodwork with fabricated or unsubstantiated stories about my client. . . . There was no briefcase of drugs, and this is an absurd fabrication." *Id.* at 121-22. That statement could be read to imply (or state) that the plaintiff "intentionally made absurdly false sexual assault allegations against Defendant." *Id.* at 135. The "November 21, 2014 Statement" provided in relevant part:

> The new, never-before-heard claims from women who have come forward in the past two weeks with unsubstantiated, fantastical stories about things they say occurred 30, 40, or even 50 years ago have escalated far past the point of absurdity. . . . Over and over again, we have refuted these new unsubstantiated stories with documentary evidence, only to have a new uncorroborated story crop up out of the woodwork.

*Id.* at 122. Similar to the Newsweek Statement, the reference to "documentary evidence," without explanation, could be read to imply the existence of undisclosed evidence clearing Defendant of

---

[12] A fourth challenged statement in *Green*, the "Washington Post Statement," asserted that the allegations of one of the plaintiffs, Tamara Green (whose maiden name is Tamara Lucier), were "absolutely false" and that "Mr. Cosby does not know the name Tamara Green or Tamara Lucier and the incident she describes did not happen." *Id.* at 123 (alteration removed). Unlike the other three statements in *Green*, Defendant did not argue the Washington Post Statement failed to contain or imply factual assertions that were capable of being proven false. *Id.* at 129 & n.13.

misconduct.[13] Critically, the court believed a fact-finder could conclude the statements did not fully disclose the non-defamatory factual bases underlying the opinions expressed. In this way, these statements differed from the Singer Letter here and the statements in *Piccone*, both of which detailed extensive underlying facts.

Granted, the Singer Letter, unlike the articles at issue in *Phantom Touring*, 953 F.2d at 730, does not include "information from which readers might draw contrary conclusions," *i.e.*, information unfavorable to Defendant's position. However, the December 22, 2014 Daily News article obviously did include such contrary information, namely, Plaintiff's allegation that Defendant raped her. Therefore, an objective reader, considering both sources, would have had both sides of the "verbal debate," *id.*, "leaving the reader free to draw his own conclusions," *Riley*, 292 F.3d at 289 (quoting *Partington*, 56 F.3d at 1157). *See also Piccone*, 785 F.3d at 774 (noting that although the defendant's statements "present[ed] a somewhat skewed view of his interaction with" the plaintiffs and the defendant "may well have been acting with a vindictive motive," "'[a]n expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified or unreasonable the opinion may be or how derogatory it is'" (quoting *Yohe v. Nugent*, 321 F.3d 35, 42 (1st Cir. 2003))).

---

[13] In *Green*, the "documentary evidence" language was an unmistakably obvious part of the "entirety" of the November 21, 2014 Statement deemed to be actionable as defamation. *See id.* at 136-37 ("[W]hen read in its entirety, the statement is capable of being understood as asserting not just that the allegations made during the previous two weeks were unsubstantiated, but also as implying they were false and entirely without merit."); *see also Ruehli v. Cosby*, 15-cv-13796-MGM (Dkt. No. 26). The Third Circuit recently affirmed the dismissal of a different defamation case brought against Defendant in the Western District of Pennsylvania based, in part, on the November 21, 2014 Statement on the grounds that it was an opinion that the plaintiff lied. *See Hill v. Cosby*, --- F. App'x ----, 2016 WL 7229817, at *3-5 (3d Cir. Dec. 14, 2016) (unpublished). But that *is* an objective fact capable of being proved true or false, which can be viewed as defamation under Supreme Court rationale. *See Milkovich*, 497 U.S. at 18 ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth."). Moreover, as explained, when combined with the "documentary evidence" language, the "entirety" could clearly be understood as "an assertion of objective fact based on undisclosed evidence." *Riley*, 292 F.3d at 292. Though this court is not persuaded by the Third Circuit's thoughtful analysis, these cases certainly demonstrate the "complex" and "dizzying" nature of judicial interpretation and application of defamation law. *Pan Am Sys.*, 804 F.3d at 64.

The court also recognizes the facts here are different from some defamation cases, because Defendant (on whose behalf Singer wrote the letter) is not an objective, third-party observer; rather, he presumably has personal knowledge as to the truth or falsity of Plaintiff's allegations. Nevertheless, as Plaintiff's counsel pointed out at the hearing, the Singer Letter does not actually deny that an incident in the Detroit hotel room occurred. (Dkt. No. 56, Tr. of Mot. Hr'g Nov. 15, 2016, at 34 ("[N]owhere does he deny—Mr. Cosby or Mr. Singer—deny the rape. They don't say the rape never happened. I didn't do it. I didn't have sex with that woman. There's no such statement.").) Instead, it merely raises doubts as to Plaintiff's credibility and castigates the Daily News for failing to include or consider information allegedly relevant to that issue, discoverable through "a simple Google search."[14] (Am. Compl., Ex. A at 1.) In the court's view, there is a subtle, yet fundamental, difference between stating or implying that an accuser's allegations are completely fabricated (and failing to fully disclose the non-defamatory facts underlying this assertion), as in *Green*, and disputing an accuser's credibility based on fully disclosed non-defamatory facts, as here.

Perhaps an argument can be made that the Singer Letter (or any other statement made by or on behalf of Defendant about the various sexual assault accusations) could constitute defamation because it necessarily implies the allegations are false simply due to Defendant's personal knowledge of the incident. The court, however, rejects this contention. At bottom, any implication supporting a defamation claim must derive primarily from the specific language used (or the "gist" derived from that language), not *merely* the known or speculative circumstances surrounding a given statement. *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 152 (1967) ("[L]ibel remains premised on the content of speech . . . ."); *Levinsky's*, 127 F.3d at 131 (explaining that a "court must evaluate a speaker's

---

[14] The court, however, rejects Defendant's argument that the Singer Letter was merely and laudably intended to address the "journalistic standards" of the Daily News and the media in general. As a legal argument, this is entirely lacking merit and plausibility. Rather, the purpose of the Singer Letter was obviously to present an opposing view and rebuke of Plaintiff's allegations based on—in Singer's assessment—her questionable credibility.

statement as it was given"); *Phantom Touring*, 953 F.2d at 729 (looking to "[t]he sum effect of the

format, tone and entire content of the articles"). Individuals publicly accused of misconduct cannot

be held completely incapable of issuing any statement in response to the allegation, other than "no

comment." They cannot be entirely chilled from navigating, at their own peril, what may be viewed

as a web of defamation law to produce a responsive statement that does not subject themselves to

liability.[15] Alternatively, an accused person cannot be foreclosed, during their responsive navigation,

from considering the issuance of a simple and unequivocal denial—free from overall defamatory

triggers or contextual themes.[16] In the court's view, such a situation would be inconsistent with basic

First Amendment principles. *Cf. Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986)

("[S]uch a 'chilling' effect would be antithetical to the First Amendment's protection of true speech

on matters of public concern . . . ."). Of course, if the statement is true and does not imply other

false and defamatory facts, it cannot give rise to a defamation claim. *See Pan Am Sys.*, 804 F.3d at 65

("Because truth can set a defendant free, so to speak, it follows that defamatory statements are not

punishable unless they are capable of being proved true or false."); *Piccone*, 785 F.3d at 771

("[D]efamation requires a false statement at its core . . . ."); *see also Gertz v. Robert Welch, Inc.*, 418 U.S.

---

[15] Many states recognize a form of "litigation privilege," which prohibits defamation claims for statements made during the course of, or in contemplation of, litigation. Some states also recognize a "conditional privilege of reply" (sometimes called a "conditional self-defense privilege"), which allows individuals, in some circumstances, to publish certain responsive statements necessary to defend their reputations. *See Green*, 138 F. Supp. 3d at 140-42 (discussing common law "conditional self-defense privilege"). Defendant contends both privileges apply here under Nevada and, to a lesser extent, Massachusetts law, which the parties view as the tactically correct choice-of-law options. Defendant provides no analysis regarding the existence of such privileges in the legally correct choice-of-law state of Michigan.

[16] Arguably, a general denial of an accusation, without any additional defamatory language, is not actionable as defamation because it cannot reasonably be understood to state or imply specific facts which are capable of being proved true or false. *See McNamee v. Clemens*, 2013 WL 3968740, at *3-4 (E.D.N.Y. July 21, 2013) (distinguishing "between general denials of accusations and specific denials or statements of fact that can be proven true or false"); *see also Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 152 (S.D.N.Y. 2016) (explaining, in addressing statements that the plaintiff's accusations of underage sexual abuse against the defendant "are untrue," have been "shown to be untrue," and "are obvious lies," that the statements "constitute[] more than a general denial"). Neither in *Green* nor in this case, however, has the court faced such a general denial.

323, 341 (1974) ("The legitimate state interest underlying the law of libel is the compensation of individuals for harm inflicted on them by defamatory *falsehood*." (emphasis added)).

Having framed the relevant defamation principles and considered the Singer Letter as a whole, the court will now address the twenty-four statements in the Singer Letter Plaintiff challenges as defamatory (each constituting a separate count). In doing so, the court addresses the statements in separate groups for organizational purposes.

3.      Counts 3, 11, 12, 17, 18, 20, 21, 22, 23, and 24

Plaintiff alleges the following statements in the Singer Letter, each specifically declaring that her allegations lack credibility, are defamatory:

- The *Daily News* could have done a simple Google search to learn that her story lacks credibility. (Am. Compl. ¶ 89, Ex. A at 1.)

- Ms. McKee's never-before-heard tale about something she claims happened back in the 1970's is completely contradicted by her own prior published statements. Ms. McKee's own statements and conduct confirming that she considers Mr. Cosby a wonderful, lovely person who treated her well, and lauding about her association with Mr. Cosby, can easily be found with just a few clicks on Google. (*Id.* ¶ 137, Ex. A at 2.)

- Instead, a mountain of evidence undermining your source's reliability was ignored by the *Daily News* in its malicious quest to publish a salacious defamatory "scoop." (*Id.* ¶ 141, Ex. A at 2.)

- To say that Ms. McKee is not a reliable source is a gross understatement. (*Id.* ¶ 163, Ex. A at 3.)

- Ample published information readily available to the *Daily News* completely undermines this story. (*Id.* ¶ 166, Ex. A at 3.)

- If someone was treated improperly, was assaulted, or was even raped, it is inconceivable that they would make these laudatory, positive statements about the alleged perpetrator. Why would someone who was allegedly raped "like" a comedy video by their alleged attacker? Why would someone who claims to have been assaulted have as their top Google+ post an episode of a television series acting along side her purported attacker? Why would she list her appearance on his show at the top of her list of professional accomplishments? It defies credulity. (*Id.* ¶ 175, Ex. A at 3.)

- The glaring inconsistency between Ms. McKee's past affectionate public sentiments about my client and what she is now claiming was alone a basis to question her veracity and render her an unreliable source. (*Id.* ¶ 184, Ex. A at 3.)

- Moreover, Ms. McKee's own description of her *private* words and conduct at the time of the alleged incident also contradicts the *Daily News'* Story. (*Id.* ¶ 189, Ex. A at 3-4 (emphasis in original).)

- When you add to the mix Ms. McKee's constant name-dropping of her association with Mr. Cosby, and her "liking" of a comedy Cosby video a year ago and reaching out to get in touch with an old friend, and her recent proud post of a video clip showing her acting alongside Mr. Cosby in the 1970's, the enormous disparity between the *Daily News* Story and her public words and conduct establish that the Story was published recklessly and with Constitutional malice. (*Id.* ¶ 196, Ex. A at 4.)

- The media blindly ignores the dubious background of sources, ignores the absence of evidence to corroborate decades-old accusations, and ignores the existence of contradictory evidence undermining its sources' claims or reliability. (*Id.* ¶ 202, Ex. A at 4.)

The court concludes the First Amendment precludes these statements from giving rise to defamation liability.[17] "The sum effect of the format, tone and entire content of the [Singer Letter] is to make it unmistakably clear that [Singer] was expressing a point of view only" based on the information he was referencing. *Phantom Touring*, 953 F.2d at 729.

The judgment of an individual's credibility is not an objective fact capable of being proven true or false. *See Piccone*, 785 F.3d at 772 ("Where an expressive phrase, though pejorative and unflattering, cannot be 'objectively verified,' it 'belongs squarely in the category of protected opinion.'" (quoting *Levinsky's*, 127 F.3d at 130)); *see also Turkish Coalition of Am. v. Bruininks*, 678 F.3d 617, 625 (8th Cir. 2012) ("Such an evaluation of credibility is essentially an opinion, 'not capable of being proven true or false,' and thus not actionable in defamation . . . ."). Like the "unprofessional" statements in *Piccone*, whether an individual's words or actions support a characterization that the

---

[17] The court emphasizes that in this section it is only directly analyzing the subjective portions of these statements—the assertions that Plaintiff lacks credibility. To the extent these statements explicitly include certain facts, those facts, which are subject to a separate analysis, are sufficiently addressed in separate sections below.

person "lacks credibility" or is an "unreliable source" is "a quintessential 'expression[] of personal judgment' which is 'subjective in nature.'" *Piccone*, 785 F.3d at 772 (quoting *Gray*, 221 F.3d at 248). The same is true as to the assertions that: Plaintiff's allegations are "completely contradicted" and "undermine[d]" "by her own prior published statements," "it is inconceivable" that the statements would be made by an assault victim, there is a "glaring inconsistency" and "enormous disparity" between the statements and Plaintiff's allegations, and Plaintiff's own description of the incident "contradicts" the article. The court "can imagine no objective evidence that might conclusively prove or disprove" these assertions. *Levinsky's,* 127 F.3d at 130. They are merely subjective opinions based upon disclosed information, and "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz*, 418 U.S. at 339-40. So long as the author fully outlines the non-defamatory facts supporting those opinions and does not imply the assertion of an undisclosed defamatory fact, such statements are not actionable. *See Piccone*, 785 F.3d at 771. That is the situation here. As discussed, unlike in *Green*, Singer adequately "communicate[d] the non-defamatory facts that undergird his opinion." *Id.*

In the end, the subjective statements regarding Plaintiff's credibility constitute opinions, and the Singer Letter discloses the factual bases underlying those opinions without implying additional defamatory facts. As a result, the statements are protected by the First Amendment and are not actionable.

    4.    <u>Counts 1, 2, 13, 15, and 19</u>

        a.    Count 1

In Count 1, Plaintiff labels as defamation the statement that "[t]he *New York Daily News* engaged in reckless conduct by publishing a malicious defamatory article with Katherine McKee's wild allegations about my client accusing him of rape." (Am. Compl. ¶ 82, Ex. A at 1.) In the very

important overall context of the Singer Letter as a whole, the court concludes this is a protected, nonactionable statement. In particular, the phrase "wild allegations," in the court's view, is the type of "loose, figurative language that no reasonable person would believe presented facts." *Levinsky's*, 127 F.3d at 128; *see also Phantom Touring*, 953 F.2d at 729 ("Whether or not the allegation of intentional deception meets the 'provable as true or false' criterion, however, we think the context of each article rendered the language not reasonably interpreted as stating 'actual facts' about appellant's honesty.").

As to the word "defamatory" in the statement, while a successful defamation claim generally requires proof a given statement is both false and defamatory, the law treats those terms as separate requirements. *See, e.g., Restatement (Second) of Torts* § 558 ("To create liability for defamation there must be . . . a false *and* defamatory statement concerning another . . . . (emphasis added)); *see Bustos v. A & E Networks*, 646 F.3d 762, 763 (10th Cir. 2011) ("But to concede that a statement is defamatory is just to say it hurts. It says nothing about the truth of the matter."). Thus, the court reads the word "defamatory" in the statement to refer to the requirement that "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Restatement (Second) of Torts* § 559; *see also Koniak*, 499 N.W.2d at 348 ("Although the popular sense of a legal term may not be technically accurate, . . . 'if technical and common parlance yield different interpretations of the same word, the constitutionally required breathing space affords protection of the writer's choice.'" (quoting *Rouch*, 487 N.W.2d at 217)). Again, Singer never actually states that Plaintiff's allegation of sexual contact generally or the specific rape allegation as appears in the complaint is false. Instead, Singer goes on to explain why—in his view—there were a number of red flags casting doubt on Plaintiff's credibility which were ignored or not investigated by the Daily News. According to Singer, the fact that the Daily News ignored or failed to investigate these alleged red flags demonstrates

"[c]onstitutional malice." (Am. Compl., Ex. A at 3; *see also id.* at 4 n.11 (citing *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969) (discussing constitutional "actual malice" standard for defamation claims brought by "public figure" plaintiffs)).) However, because Singer disclosed the facts underlying his subjective assertion, the statement is not actionable.

        b.      Count 2

In Count 2, Plaintiff challenges the statement that "[e]asily available public information, including Ms. McKee's own laudatory words about Mr. Cosby, belie the *Daily News'* Story." (Am. Compl. ¶ 85, Ex. A at 1.) Specifically, Plaintiff takes issue with the description of her words as "laudatory." (*Id.* ¶ 85.) This, again, is an inherently subjective characterization, incapable of being proven true or false. Moreover, the Singer Letter directly discloses the alleged statements, allowing readers to review them and reach their own conclusions, so there are no implied, undisclosed defamatory facts.

        c.      Count 13

In Count 13, Plaintiff challenges Singer's statement that "[t]he *Daily News* was so intent on smearing my client that it recklessly labeled as 'rape' an alleged sexual encounter in the 1970's during which (according to your own story) the accuser *never objected, never said no, did not attempt to end the encounter, went to a party that night with her alleged attacker (and drove him to the party in her own car)*." (Am. Compl. ¶ 145, Ex. A at 2 (emphasis in original).) Contrary to Plaintiff's allegation, Singer did not assert these facts but, rather, claimed Plaintiff did in the December 22, 2014 article. Singer further opined that the Daily News recklessly labeled the "alleged" encounter as rape. The article quotes Plaintiff as stating: "I was mad at my own self for not saying, 'What the f---?' Why didn't I stop it and get him away from me? But it happened too fast. I was absolutely flabbergasted." (Dkt. No. 42, Ex. C at 3; Dkt. No. 47, Ex. A at 3.) Moreover, the article states:

> McKee said she quickly fled to the bathroom to compose herself. Cosby got dressed, and the two shared an icy silence in the elevator down to the lobby, where someone

was waiting to escort them to the boat party. "I never said a word. I was too uncomfortable about it," she recalled. "Bill was so rude and cold toward me the rest of the night. I thought, 'when this boat docks, I'm out of here.' I just left."

(*Id.*)[18]

Clearly, the assertions in the complaint could substantiate a rape allegation, and the court must presume those allegations are true at this stage of the litigation.[19] But the actual claim here is that of defamation based on the Singer Letter, and the court must narrowly rule only on the motion to dismiss the legal claim raised in the complaint. In this regard, the court observes the facts underlying the opinion in the Singer Letter actually come from the December 22, 2014 article itself, and Plaintiff does not dispute their accuracy. Again, "'[a]n expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified or unreasonable the opinion may be or how derogatory it is.'" *Piccone*, 785 F.3d at 774 (quoting *Yohe*, 321 F.3d at 42). As a result, this statement is not actionable.

> d.      Count 15

In Count 15, Plaintiff alleges the following is a "false and defamatory communication of and concerning" her:

The media has routinely ignored relevant information including:

- Criminal Backgrounds of various accusers, such as arrests for lying to the police and other crimes involving dishonesty

- Information from third party sources disputing the credibility of sources and their accusations

- Independent evidence proving accusations impossible

---

[18] To be sure, the article does not actually state that Plaintiff drove Defendant to the party in her own car. However, this one inaccurate assertion, in the court's view, does not render the statement as a whole materially false and is not itself "defamatory," in light of the other facts contained in the article and accurately recounted by the Singer Letter.

[19] Plaintiff alleges in the amended complaint that Defendant "intimidated, terrified, and terrorized [her] with pain and overwhelming physical force," and that "[t]he rape was an unprovoked and violent act" which "was shocking, scary and horrible." (Am. Compl. ¶¶ 20, 22.)

(Am. Compl. ¶¶ 156-57, Ex. A at 3.) In context, however, it is clear these statements are not "concerning" Plaintiff. *See, e.g., Curtis v. Evening News Ass'n*, 352 N.W.2d 355, 356 (Mich. Ct. App. 1984) (emphasizing that to succeed on a claim for defamation, the plaintiff must prove the statement is "concerning" the plaintiff). Directly preceding the challenged statement, the Singer Letter states:

> This Story confirms the *Daily News* maintains virtually no journalistic standard or credibility threshold for publishing the stories of anyone who approaches your paper with accusations about my client. The *Daily News* has sunk to a new low in what it is passing off as "journalism." Unfortunately, the *Daily News* is not alone. The media has consistently refused to look into or publish information about various women whose stories are contradicted by their own conduct or statements.

(Am. Comp., Ex. A at 2-3.) After stating "the *Daily News* is not alone," Singer is clearly referencing other women who have come forward with similar allegations of sexual assault against Defendant. Accordingly, the bullet-points do not reference Plaintiff and, as a result, these statements are not actionable.

      e.      Count 19

In Count 19, Plaintiff also alleges the following is a "false and defamatory communication of and concerning" her: "Now, the media's approach is to publish virtually any tale 'no questions asked' told by anyone willing to vouch for it, without questioning their motivations, their pasts, or even the criminal records of some accusers." (Am. Compl. ¶¶ 170-71, Ex. A at 3.) In particular, Plaintiff challenges the alleged assertion that she has a "criminal record[]." (Am. Compl. ¶ 172.) Again, however, this statement is not "concerning" Plaintiff. In the court's view, the references to "the media's approach" and "the criminal records of *some* accusers," especially when read in context with the Singer Letter as a whole, makes clear that the statement is not sufficiently directed at Plaintiff to be actionable. (*Id.*, Ex. A at 3 (emphasis added).)

5.      Counts 4, 5, 7, 9, and 10

      a.      Counts 4 and 9

In Count 4, Plaintiff challenges the statement: "Ms. McKee's published statements in 2010 confirm that she counts Bill Cosby as a *friend*, and that he is among a group of *'very wonderful, lovely men' whom she says 'treated me wonderfully.'*" (Am. Compl. ¶ 93, Ex. A at 1 (emphasis in original).) Plaintiff asserts that she "never said [Defendant] is 'wonderful' or a 'lovely man'" and that Singer misquoted the article cited as support for this statement.[20] (Am. Compl. ¶ 95.) In Count 9, Plaintiff challenges the statement: "Ms. McKee has said about the time while she was Sammy Davis, Jr.'s *'road wife,'* 'it was very common to be in and out of affairs' and 'As far as I'm concerned, my life has been wonderful. It's been blessed with lovely, wonderful men. I was free, and single and *I had fun and I had a wonderful life.*'" (Am. Compl. ¶ 124, Ex. A at 2 (emphasis in original).) Again, Plaintiff asserts that "in the article cited by Singer, [she] did not include [Defendant] among the men that she said treated her wonderfully." (Am. Compl. ¶ 125.)

      The article cited as support for both statements, linked to its webpage in the Singer Letter via footnotes following the challenged statements, is entitled "Former Vegas showgirl reflects on wild youth"; it was published by C & G Newspapers on July 10, 2010 and written by Jennie Miller. (Dkt. No. 42, Ex. D; Dkt. No. 47, Ex. C.) The article, which contains numerous quotes from Plaintiff regarding her early career and associations with celebrities, states in relevant part:

> She had a secret love affair with Johnny Carson. She dated Christopher Walken, Tony Curtis, Ben Gazzara and Clifton Davis. She counts Billy Crystal and Bill Cosby as friends.
>
> "Show business is a whole 'nother world," McKee said. "People in show business are out there meeting so many wonderful people, and it's very common to be in and out of affairs, unless you're married. You're in the limelight, people are after you, men are chasing you. And these were very wonderful, lovely men. They treated me wonderfully."

---

[20] Plaintiff does not take issue with the word "friend" in Count 4, but does in Count 14, discussed below.

Those who are still alive today—like Clifton Davis—McKee said she maintains a friendship with.

"I didn't burn any bridges," she said. "As far as I'm concerned, my life has been wonderful. It's been blessed with lovely, wonderful men. I was free, and single and I had fun and I lived a wonderful life."

(*Id.* at 2-3.)[21]

Plaintiff argues the C & G Newspapers article "plainly shows that [she] never said [Defendant] treated her wonderfully." (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 10.) The court, however, is not convinced. The article is ambiguous as to whether the "wonderful, lovely men" whom Plaintiff claimed "treated [her] wonderfully" refers only to the men she dated, as Plaintiff claims in her declaration, (Pl.'s Decl. ¶ 59), or whether the statement refers to all the aforementioned men, including Billy Crystal and Defendant, who are merely listed as friends. Because Singer's interpretation of the article is reasonable and the Singer Letter provides citations and webpage links to the article—so that readers can examine the text themselves and determine whether Singer's interpretation finds support—the challenged statements are not actionable. *See Masson*, 501 U.S. at 519 ("The protection for rational interpretation serves First Amendment principles by allowing an author the interpretative license that is necessary when relying upon ambiguous sources.").[22]

    b.    Count 5

In Count 5, Plaintiff challenges the statement that "[a] year ago, Ms. McKee 'liked' one of Mr. Cosby's YouTube comedy videos and posted a fond message wanting to get in touch with him, saying 'Hey Bill . . . . . . . I am trying to reach you.'" (Am. Compl. ¶ 98, Ex. A at 1.) In particular, Plaintiff alleges she "did not post a fond message about [Defendant]" but, rather, "posted a

---

[21] In the December 22, 2014 Daily News article, Plaintiff is quoted as saying: "Back then, I was [Sammy Davis Jr.'s] road wife. He had an open marriage, and we were lovers. That's how it went." (Dkt. No. 42, Ex. C at 2; Dkt. No. 47, Ex. A at 2.)

[22] Plaintiff does not assert in Counts 4 and 9 that the C & G Newspapers article itself is defamatory and that Defendant is liable for repeating another's defamatory statement. Even if she had, however, the court would conclude such a claim fails for the reasons discussed in footnote 25, *infra*.

comment that she wanted to contact [Defendant] in order to confront [him] about the rape that he committed in 1974." (Am. Compl. ¶ 100.) Plaintiff further alleges Defendant responded to her YouTube comment by stating "I bet you are." (*Id.* ¶ 101.)

Plaintiff does not deny that she "liked" Defendant's video on YouTube or that she posted the message quoted in the Singer Letter. As to her assertion the comment was not "a fond message," the comment itself provides no indication as to the reason Plaintiff was "trying to reach" Defendant. Moreover, the characterization of the comment, on its face, as "fond" or otherwise is not capable of objective verification or defamatory meaning. Accordingly, the statement is not actionable.

    c.    Count 7

In Count 7, Plaintiff challenges the statement that "Ms. McKee has admitted, 'I had to do a lot of lying' and 'lies landed her a job' as a Vegas showgirl." (Am. Compl. ¶ 109, Ex. A at 1.) Plaintiff alleges that in the July 10, 2010 C & G Newspapers article cited as support, she was not quoted as saying "lies landed her a job"; rather, that statement was made by the reporter. (Am. Compl. ¶ 114.) Plaintiff also alleges she was misquoted as having said "I had to do a lot of lying." (*Id.* ¶ 113.) In addition, Plaintiff alleges Singer misconstrued the article, which discussed Plaintiff's need to "downplay the fact that she was mixed-race, and that she was only sixteen . . . years old at the time," in light of the "well-known segregationist policy that [the hotels in Las Vegas] would never hire a black showgirl" at the time. (*Id.* ¶¶ 112, 117.)

The article, after discussing Plaintiff's "dreams of making it big in show business" and the fact that she knew she had to leave Michigan and "'go to California'" to pursue those dreams, states in relevant part:

    She also said she had to lie.

27

"In the 1960s, when I left home, there was still a lot of segregation," said the woman whose mother was German, Finish and Swedish, and whose father was African-American and American Indian.

"I just said I was white, but I'm mixed," she said. "Back then, it was easier to get doors to open. It wasn't accepted to be mixed and to have black blood in you. I had to do a lot of lying. I said I was white. And I said I was 23 years old, but I was 16."

The lies landed her a job. She signed a contract at the Stardust Hotel to be a showgirl—reportedly the first black Vegas showgirl—wearing very little clothing but larger-than-life regalia with colorful feathers and shimmering accessories.

Dkt. No. 42, Ex. D at 2; Dkt. No. 47, Ex. C at 2.)

Plaintiff is correct that the article does not actually quote her as stating "lies landed her a job." Nevertheless, despite this misattribution, the challenged statement is substantially true. *See Masson*, 501 U.S. at 516 (rejecting "any special test of falsity for quotations" and relying on the common law substantial truth doctrine). The article does state—and Plaintiff does not deny—that Plaintiff lied "in order to get a job as a Las Vegas Showgirl." (Am. Compl. ¶ 112.)[23] Accordingly, the challenged statement would not "have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Collins*, 627 N.W.2d at 9 (quoting *Masson*, 501 U.S. at 517). In addition, the Singer Letter provides a link to the article, so the reader can learn the larger context of the segregationist practices of the Las Vegas hotels in the 1960s, which necessitated Plaintiff's misrepresentation. As a result, the statement is not actionable.

        d.      Count 10

In Count 10, Plaintiff challenges the statement:

Her own younger sister, Lonette, who worked as Mr. Cosby's secretary, has said about Katherine McKee during the relevant era that her "older sister, she was walking on the wild side, was always wild, was always a rebel, always doing inappropriate things, never conformed, thought she could break all the rules and did."

---

[23] Again, however, Plaintiff does deny she gave the specific statement "I had to do a lot of lying," quoted in the article. (*Id.* ¶ 113.) Even assuming Singer's statement is materially false and defamatory in claiming Plaintiff stated those words, the complaint does not allege sufficient facts demonstrating "actual malice," which is required for a limited-purpose-public-figure plaintiff. *See* footnote 25, *infra*.

(Am. Compl. ¶ 130, Ex. A at 2.) Plaintiff alleges that

> Singer's statements are false, misleading and defamatory as follows: (1) [Plaintiff's] younger sister Lonette McKee was only 17 years old when she allegedly worked as [Defendant's] "secretary"; (2) Lonette McKee was never the secretary of [Defendant], but instead worked as a "go-fer," or what would be called an "intern" today, on the set of "The Bill Cosby Show" in 1970 or 1971; (3) the substance of what Lonette McKee said must be understood in the context of the full quote of what Lonette actually said, which is that Lonette McKee was preparing to play a dramatic role of a character called "Sister" in the movie picture "Sparkle" released in 1976. Lonette McKee said in that interview that she modeled her dramatic portrayal on several people including her older sister [Plaintiff] and some of [Plaintiff's] friends. Lonette McKee's comments had nothing to do with [Defendant], nor with [Plaintiff's] allegation that [Defendant] raped her. Singer deliberately and with actual malice, defamed [Plaintiff] by misconstruing the four-your old interview given by [Plaintiff's] younger sister in an attempt to discredit [Plaintiff].

(Am. Compl. ¶ 134.)

The court concludes the challenged statement is neither materially false nor defamatory. Again, the Singer Letter provides links to both the article in which Lonette McKee is quoted as having made the statement attributed to her by Singer—which Plaintiff does not deny as being accurate—as well as a 1986 People Magazine article stating that she worked as a secretary for Defendant. The statement, in the court's view, does not imply Plaintiff's sister made the comment with reference to Defendant or Plaintiff's rape allegation, and readers can examine the article for themselves, using the link provided in the Singer Letter, to learn the larger context of the comment. The statement, therefore, is not actionable.

      6.     <u>Counts 6, 8, 14, and 16</u>

          a.     Counts 6 and 8

In Count 6, Plaintiff challenges the statement: "On a promotional webpage for an acting 'Master Class' with Ms. McKee 'For the period: Dec. 16-22, 2014,' she touts her association with Mr. Cosby, saying she 'has enjoyed a 40-year career in show business' and has 'worked with such legends as . . . Bill Cosby.'" (Am. Compl. ¶ 103, Ex. A at 1.) Plaintiff alleges that she "obtained her screen actor's guild card as a result of appearing on 'The Bill Cosby Show' in 1971" and that "[t]his acting

credit appears along with other acting credits on her filmography found on the internet. Singer has distorted this historical fact into a defamatory statement by implying some kind of duplicity on the part of [Plaintiff] which does not exist." (Am. Compl. ¶¶ 105-06.) In Count 8, Plaintiff challenges the statement: "This month, Ms. McKee posted on her own Google+ page a 1970 video clip of herself acting with my client on the *Bill Cosby Show*, with her gloating caption, 'That's me with Bill Cosby 1970.'" (Am. Compl. ¶ 120, Ex. A at 2.) Plaintiff appears to take issue with the word "gloating." (Am. Compl. ¶ 22.)

Although Plaintiff alleges, with regard to both statements, that "[t]his is a false and defamatory communication of and concerning [Plaintiff], which is not privileged or opinion, and was published to the New York Daily News," (*id.* ¶¶ 104, 121), the court considers such allegations to be just the type of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678. Plaintiff's complaint fails to provide any minimal factual development in support of the assertion that these statements are "false." *See id.* ("A pleading that offers 'label and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it renders 'naked assertion[s]' devoid of 'further factual enhancement.'" (quoting *Twombly*, 550 U.S. at 555, 557)).[24]

In any event, even if the court did presume falsity, it could not conclude that the statements are susceptible to a defamatory meaning in the sense of being harmful to Plaintiff's reputation. The assertion that Plaintiff stated on a promotional website for an acting class that she "has enjoyed a 40-year career in show business" and "worked with such legends as . . . Bill Cosby" does not "tend to lower [Plaintiff's] reputation in the community or deter third persons from associating or dealing

---

[24] The court cannot verify for itself whether the sources contain the alleged statements, because the webpage links provided in the Singer Letter no longer work.

with" her. *Armstrong*, 596 F. App'x at 441 (quoting *Ireland*, 584 N.W.2d at 636). Nor does the

assertion that Plaintiff posted a video clip of her acting with Defendant on her Google+ page with

the caption: "That's me with Bill Cosby 1970." As for the assertions that Plaintiff "tout[ed] her

association with" Defendant on the promotional website and included a "gloating caption" on her

Google+ page, these are subjective characterizations, not capable of being proven true or false.

Accordingly, Plaintiff has failed to state claims upon which relief may be granted in Counts 6 and 8.

       b.     Count 14

    In Count 14, Plaintiff challenges the statement that she "remained [Cosby's] friend and

traded on his name for 40 years." (Am. Compl. ¶ 150, Ex. A at 2.) Plaintiff alleges she "does not

consider [Defendant] a friend, and has never 'traded on his name,'" as she "realized [he] was not her

friend" after the rape and "has never attributed any success in her career in the entertainment

industry to [Defendant]." (Am. Compl. ¶¶ 152-53.) However, as discussed above, the July 10, 2010

C & G Newspapers article, in which Plaintiff was interviewed, did state Plaintiff "counts Billy

Crystal and Bill Cosby as friends." (Dkt. No. 42, Ex. D at 2; Dkt. No. 47, Ex. C at 2.) Reading the

Singer Letter as a whole, the court concludes a reasonable reader would not believe Singer was

claiming Plaintiff and Defendant remained friends but, rather, that the article containing the

assertion could be found through easily available public sources, such as "a simple Google search,"

and that the Daily News either ignored or failed to investigate these sources.[25]

---

[25] The court notes that many states subject re-publishers of defamatory statements to liability in the same manner as the original publisher, *see Gray*, 221 F.3d at 249-50; *Restatement (Second) of Torts* § 578 ("[O]ne who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it."), although it is unclear whether Michigan recognizes this doctrine. Therefore, to the extent a reader could believe Singer was claiming Plaintiff previously stated she considered Defendant a "friend" in a newspaper interview, and assuming that statement is both false and susceptible to a defamatory meaning, Defendant may be argued to be liable under this republication doctrine. Even under that scenario, however, Defendant also contends he is not liable because Plaintiff is a limited purpose public figure and the complaint does not allege facts supporting "actual malice." The court agrees. By publicly disclosing her allegations during an interview with Nancy Dillon of the Daily News, Plaintiff "voluntarily inject[ed] [herself] . . . into a particular controversy and thereby bec[ame] a public figure for a limited range of issues," *i.e.*, the public controversy over Defendant's alleged sexual assault of Plaintiff and others. *Lluberes v. Uncommon Prods., LLC*, 663 F. 3d 6, 13 (1st Cir. 2011) (quoting *Gertz*, 418 U.S. at 351). As such, to recover for defamation, Plaintiff must demonstrate Defendant acted with "'actual malice'—that is, with knowledge that [the statement] was false or with reckless disregard of whether it was false

Moreover, as to the assertion that Plaintiff "traded on [Defendant's] name for 40 years," this, again, is not an objective fact capable of being proven true or false. Plaintiff herself admits that she has listed her appearance on *The Bill Cosby Show* in 1971—which "allowed [her] to get [her] Screen Actors Guild card"—"first in a chronological list of [her] acting credits," "as is custom and practice in the entertainment industry." (Pl.'s Decl. ¶¶ 44, 46; *see also* Am. Compl. ¶¶ 105-06.) Whether such a listing of Plaintiff's professional acting credits amounts to "trad[ing] on [Defendant's] name" is a subjective characterization and, therefore, may not form the basis for a defamation claim. *See Levinsky's*, 127 F.3d at 129 ("The vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be actionable."). Accordingly, the challenged statement is not actionable.

c. Count 16

Lastly, Plaintiff challenges the statement that her rape allegation against Defendant is a "four-decade old but never-before-heard tale." (Am. Compl. ¶ 160, Ex. A at 3.) Despite alleging in conclusory fashion that "[t]his statement is a false and defamatory communication," Plaintiff fails to allege that she disclosed the rape allegation prior to her interview with Nancy Dillon of the Daily News in December of 2014. In fact, Plaintiff asserts in her declaration: "I never spoke publicly about the rape, before telling Nancy Dillon about it in December 2014, because I was afraid of [Defendant]." (Pl.'s Decl. ¶ 35; *see also id.* ¶ 43 ("It was not until the Nancy Dillon interview in December 2014, that I felt comfortable talking about the rape publicly for the first time.").) Accordingly, both the timing of the alleged rape and the fact that it had never previously been publicly disclosed are actually undisputed. *See Green*, 138 F. Supp. 3d at 136 ("The truth of portions of the statement, such as the length of time between when the incidents allegedly occurred and the

---

or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). Plaintiff's complaint, however, fails to allege facts plausibly suggesting Defendant knew the statement attributed to Plaintiff by the C & G Newspapers article was not actually uttered by Plaintiff or recklessly disregarded that possibility. *See Shay v. Walters*, 702 F.3d 76, 82-83 (1st Cir. 2012) (discussing pleading requirements for demonstrating fault in defamation claims).

date on which any particular allegation become public, is uncontested."). The word "tale" is closer to the line but, in light of the Singer Letter as a whole, is too subjective to give rise to defamation liability. *See Piccone*, 785 F.3d at 772 (collecting First Circuit cases which have rejected defamation claims based on the words "trashy," "fake" and "phony," and "scam"); *see also Milkovich*, 497 U.S. at 16-17.[26]

## V.   CONCLUSION

For these reasons, the court ALLOWS Defendant's motion to dismiss. (Dkt. No. 41.)

It is So Ordered.

_/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge

---

[26] Although the November 21, 2014 Statement in *Green* contains a similar phrase—"the new, never-before-heard claims"—that language was not why the court held the statement actionable. *See Green*, 138 F. Supp. 3d at 136. The November 21, 2014 Statement also characterized the sexual assault allegations as "fantastical stories" which "have escalated far past the point of absurdity," in addition to referencing, without explanation or support, "documentary evidence" used to "refute[] these new unsubstantiated stories." *Id.* at 122. As discussed above, the November 21, 2014 Statement in *Green* is different from the Singer Letter when both are read as a whole, considering the extensive facts cited as support for the opinions in the Singer Letter; each statement asserts or implies far different messages. As explained, the Singer Letter, viewed in its "entirety," sends an opinionated credibility message based on cited detail. *Compare* footnote 13, *supra* (explaining that the "entirety" of the November 21, 2014 Statement in *Green* deemed to be actionable includes the unexplained "documentary evidence" language (citing *Green*, 138 F. Supp. 3d at 136-37 and *Ruehli*, 15-cv-13796-MGM (Dkt. No. 26))).

# Appendix

## LAVELY & SINGER
PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
SUITE 2400
2049 CENTURY PARK EAST
LOS ANGELES, CALIFORNIA 90067-2906
TELEPHONE (310) 556-3501
FACSIMILE (310) 556-3615
www.LAVELYSINGER.com

JOHN H. LAVELY, JR.
MARTIN D. SINGER
BRIAN G. WOLF
LYNDA B. GOLDMAN
MICHAEL D. HOLTZ
PAUL N. SORRELL
MICHAEL E. WEINSTEN
EVAN N. SPIEGEL

TODD S. EAGAN□
ANDREW B. BRETTLER*
DAVID B. JONELIS
ZEV F. RABEN□
JONATHAN M. KLEIN

ALLISON S. HART
HENRY L. SELF, III
OF COUNSEL

□ ALSO ADMITTED IN NY
* ALSO ADMITTED IN NY AND NJ

December 22, 2014

### CONFIDENTIAL LEGAL NOTICE
### PUBLICATION OR DISSEMINATION IS PROHIBITED

**VIA EMAIL:** calderman@nydailynews.com
legal@nydailynews.com

Cyna J. Alderman, Esq.
SVP and General Counsel
Daily News, L.P.
4 New York Plaza, 6th Floor
New York, NY 10004

**VIA EMAIL:** ndillon@nydailynews.com

Ms. Nancy Dillon
West Coast Bureau Chief
New York Daily News

Re:   Bill Cosby / *New York Daily News*, Daily News, L.P., *et al.*
Our File No.: 980-49

Dear Ms. Alderman and Ms. Dillon:

We are litigation counsel to Bill Cosby.  The *New York Daily News* engaged in reckless conduct by publishing a malicious defamatory article with Kathrine McKee's wild allegations about my client accusing him of rape.  Easily available public information, including Ms. McKee's own laudatory words about Mr. Cosby, belie the *Daily News'* Story. The *Daily News* could have done a simple Google search to learn that her story lacks credibility.  What would you have found?

- Ms. McKee's published statements in 2010 confirm that she counts Bill Cosby as a *friend,* and that he is among a group of *"very wonderful, lovely men" whom she says "treated me wonderfully"*[1]

- A year ago, Ms. McKee "liked" one of Mr. Cosby's YouTube comedy videos and posted a fond message wanting to get in touch with him, saying "Hey Bill…….I am trying to reach you"[2]

- On a promotional webpage for an acting "Master Class" with Ms. McKee "For the period: Dec. 16-22, 2014," she touts her association with Mr. Cosby, saying she "has enjoyed a 40-year career in show business" and has "worked with such legends as … Bill Cosby"[3]

- Ms. McKee has admitted, *"I had to do a lot of lying"* and *"lies landed her a job"* as a Vegas showgirl[4]

Cyna J. Alderman, Esq.
Ms. Nancy Dillon
Re:   Bill Cosby / *New York Daily News,* Daily News, L.P., *et al.*
December 22, 2014
Page 2

---

- This month, Ms. McKee posted on her own Google+ page a 1970 video clip of herself acting with my client on *The Bill Cosby Show*, with her gloating caption, "That's me with Bill Cosby 1970"[5]

- Ms. McKee has said about the time while she was Sammy Davis, Jr.'*s* *"road wife,"* "it was very common to be in and out of affairs" and "As far as I'm concerned, my life has been wonderful. It's been blessed with lovely, wonderful men. I was free, and single and *I had fun and I had a wonderful life*"[6]

- Her own younger sister, Lonette, who worked as Mr. Cosby's secretary,[7] has said about Kathrine McKee during the relevant era that her "older sister, she was walking on the wild side, was always wild, was always a rebel, always doing inappropriate things, never conformed, thought she could break all the rules and did."[8]

Ms. McKee's never-before-heard tale about something she claims happened back in the 1970's is completely contradicted by her own prior published statements. Ms. McKee's own statements and conduct confirming that she considers Mr. Cosby a wonderful, lovely person who treated her well, and lauding about her association with Mr. Cosby, can easily be found with just a few clicks on Google. Instead, a mountain of evidence undermining your source's reliability was ignored by the *Daily News* in its malicious quest to publish a salacious defamatory "scoop." It is obvious that the *Daily News* did not even bother to do something as simple as a web search before recklessly accusing my client of rape and publishing its "EXCLUSIVE" article "**RAT PACK ATTACK | Bill Cosby accused of raping ex-girlfriend of Sammy Davis Jr.**" (the "Story").

Your source claims that 40 years ago, during the time that she says she was Sammy Davis, Jr.'s "road wife," my client allegedly raped her standing at the door of a Detroit hotel room after she brought him ribs, *following which she went to a party with him*. The *Daily News* was so intent on smearing my client that it recklessly labeled as "rape" an alleged sexual encounter in the 1970's during which (according to your source's own story) the accuser *never objected, never said no, did not attempt to end the encounter, went to a party that night with her alleged attacker (and drove him to the party in her own car), and remained his friend and traded on his name for 40 years.*

This Story confirms that the *Daily News* maintains virtually no journalistic standard or credibility threshold for publishing the stories of anyone who approaches your paper with accusations about my client. The *Daily News* has sunk to a new low in what it is passing off as "journalism." Unfortunately, the *Daily News* is not alone. The media has consistently refused to look into or publish information about various women whose stories are contradicted

Cyna J. Alderman, Esq.
Ms. Nancy Dillon
Re:   Bill Cosby / *New York Daily News,* Daily News, L.P., *et al.*
December 22, 2014
Page 3

---

by their own conduct or statements.  The media has routinely ignored relevant information including:

- Criminal backgrounds of various accusers, such as arrests for lying to police and other crimes involving dishonesty

- Information from third party sources disputing the credibility of sources and their accusations

- Independent evidence proving accusations impossible

It is obvious that either the *Daily News* failed to do even the most simplistic and rudimentary investigation of Ms. McKee's story before rushing to publish her four-decade-old but never-before-heard tale, or alternatively, that the *Daily News* actually *knew* that Ms. McKee's own prior statements and conduct are totally inconsistent with and undermine her new story, but published the "rape" story anyway.  In either case, the *New York Daily News* published its story with Constitutional malice.

To say that Ms. McKee is not a reliable source is a gross understatement.  Ample published information readily available to the *Daily News* completely undermines this story. The fact that the *Daily News* ran this Story reveals that, like many of its media cohorts, its publication standards have sunk to depths that in past decades even supermarket tabloids would not deign to sink.  Now, the media's approach is to publish virtually any tale "no questions asked" told by anyone willing to vouch for it, without questioning their motivations, their pasts, or even the criminal records of some accusers.  This is not journalism.  Such biased reporting is outrageous and unconscionable.  It also gives rise to substantial liability.

The evidence that the *Daily News* ought to have found and considered before running this defamatory Story runs that gamut from recent published interviews, to praise posted on social media, to professional promotional listings.   If someone was treated improperly, was assaulted, or was even raped, it is inconceivable that they would make these laudatory, positive statements about the alleged perpetrator.  Why would someone who was allegedly raped "like" a comedy video by their alleged attacker?  Why would someone who claims to have been assaulted have as their top Google+ post an episode of a television series acting along side her purported attacker?  Why would she list her appearance on his show at the top of her list of professional accomplishments?[9]  It defies credulity.  Tellingly, the *Daily News* never bothered to ask such questions, quick to advance its agenda of labeling my client a rapist.

The glaring inconsistently between Ms. McKee's past affectionate public sentiments about my client and what she is now claiming was alone a basis to question her veracity and render her an unreliable source.[10]  Moreover, Ms. McKee's own description of her *private*

Cyna J. Alderman, Esq.
Ms. Nancy Dillon
Re:     Bill Cosby / *New York Daily News*, Daily News, L.P., *et al.*
December 22, 2014
Page 4

---

words and conduct at the time of the alleged incident also contradicts the *Daily News'* Story. When you add to the mix Ms. McKee's constant name-dropping of her association with Mr. Cosby, and her "liking" of a comedy Cosby video a year ago and reaching out to get in touch with an old friend, and her recent proud post of a video clip showing her acting alongside Mr. Cosby in the 1970's, the enormous disparity between the *Daily News* Story and her public words and conduct establish that the Story was published recklessly and with Constitutional malice.

This defamatory Story is the latest example of your coverage demonstrating that your newspaper maintains virtually no standard or credibility threshold for publishing the stories of anyone who approaches the *Daily News* with accusations about my client, no questions asked. The media blindly ignores the dubious background of sources, ignores the absence of evidence to corroborate decades-old accusations, and ignores the existence of contradictory evidence undermining its sources' claims or reliability. Meanwhile, as has been amply publicized and commented upon by legal scholars, my client risks being sued for defamation (as has already occurred) if he so much as denies any scurrilous accusations made against him.

Like other irresponsible media, the *Daily News* is recklessly clamoring to add to the din of "me too" claims without investigating the reliability of its sources. This exposes the *Daily News* to very significant liability.[11]

"'Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers.'"[12] The *Daily News* should stop resorting to "scandal sheet" journalism. It will have only itself to blame if it finds itself in court attempting to defend its ongoing pattern of recklessly and maliciously publishing outlandish stories about my client fitting with its predetermined smear agenda. Publication of a retraction and correction of the defamatory Story is demanded.

This does not constitute a complete or exhaustive statement of all of my client's rights or claims. Nothing stated herein is intended as, nor should it be deemed to constitute a waiver or relinquishment, of any of my client's rights or remedies, whether legal or equitable, all of which are hereby expressly reserved. This letter is a confidential legal communication and is not for publication.

Sincerely,

MARTIN D. SINGER

MDS/lg

cc:    Mr. William H. Cosby

Cyna J. Alderman, Esq.
Ms. Nancy Dillon
Re:   Bill Cosby / *New York Daily News*, Daily News, L.P., *et al.*
December 22, 2014
Page 5

---

1. "She counts Billy Crystal and Bill Cosby as friends. 'People in show business are out there meeting so many wonderful people, and it's very common to be in and out of affairs, unless you're married. You're in the limelight, people are after you, men are chasing after you. And these were very wonderful, lovely men. They treated me wonderfully.' Those who are still alive today ... McKee said she maintains a friendship with. 'I didn't burn any bridges,' she said. 'As far as I'm concerned, my life has been wonderful. It''sbeen blessed with lovely, wonderful men. I was free, and single and I had fun and I had a wonderful life.''" *C & G Newspapers*, *"Former Vegas showgirl reflects on wild youth"* (July 7, 2010)
< http://www.candgnews.com/Homepage-Articles/2010/07-07-10/Katherine-McKee-showgirl.asp >

2. < https://www.youtube.com/user/kathrinemckee >
< https://www.youtube.com/watch?v=cUZgOlcVrnc >

3. "McKee is excited to share her experiences in Hollywood with the people of Detroit and bring to Michigan some of the many stars and celebrities she has known and worked with throughout her long career in show business. McKee, herself, has enjoyed a 40-year career in show business that has taken her around the globe. **She has worked with such legends as** Richard Pryor, Sammy Davis Jr., **Bill Cosby** and Clifton Davis." *Encore Michigan* (Dec. 16-22, 2014)
< http://www.encoremichigan.com/article.html?article=3251 >

4. *C & G Newspapers*, *"Former Vegas showgirl reflects on wild youth"* (July 7, 2010)
< http://www.candgnews.com/Homepage-Articles/2010/07-07-10/Katherine-McKee-showgirl.asp >

5. < https://plus.google.com/113662289241530517375/posts >

6. *C & G Newspapers*, *"Former Vegas showgirl reflects on wild youth"* (July 7, 2010)
< http://www.candgnews.com/Homepage-Articles/2010/07-07-10/Katherine-McKee-showgirl.asp >

7. *People Magazine*, *"After Singing Her Own Blues, Lonette Mckee Finds a Perch as Off Broadway's Billie Holiday"* (November 3, 1986)
< http://www.people.com/people/archive/article/0,,20094908,00.html >

8. PopMatters, *"Giving Us Something We Can Feel: An Interview with Lonette McKee"* (August 11, 2010)
< http://www.popmatters.com/feature/129327-giving-us-something-we-can-feel-an-interview-with-lonette-mckee/ >

9. < http://www.kathymckeecasting.com/biography.html >

10. *See Suzuki Motor Corp. v. Consumers Union of United States, Inc.,* 330 F.3d 1110, 1134 (9th Cir. 2003) ("the jury may nevertheless infer that the publisher was aware of the falsity if it finds that there were 'obvious reasons to doubt' the accuracy of the story, and that the defendant did not act reasonably in dispelling those doubts.").

Cyna J. Alderman, Esq.
Ms. Nancy Dillon
Re:    Bill Cosby / *New York Daily News,* Daily News, L.P., *et al.*
December 22, 2014
Page 6

11. *See Goldwater v. Ginzburg,* 414 F.2d 324, 337 (2nd Cir. 1969) ("[r]epetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his reports").

12. *Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 539 (7th Cir. 1982) (quoting *Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 170, 87 S. Ct. 1975, 1999, 18 L. Ed. 2d 1094 (1967)) in the context of discussing an article written with a pre-conceived agenda and published with reckless disregard of its truth or falsity.

K:\980-49\LET\MDS-NYDN 122214 (v6).wpd